**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Rene Madera-Font, | No. CV-22-08225-PCT-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

Pending before the Court is Defendant United States of America's (the "Government") Motion for Summary Judgment. (Doc. 52). For the reasons described below, the Government's motion is denied.

## BACKGROUND

From January 22, 2019 to January 20, 2021, Plaintiff Rene Madera-Font worked as a physician with the Northern Arizona VA Health Care System in Prescott, Arizona ("VA"). (Doc. 53 at 1; Doc. 57 at 2). Plaintiff is a licensed physician and has been board certified in family medicine, emergency medicine, and forensic medicine. (Doc. 53 at 1, 5; Doc. 57 at 2).

Just before leaving his position at the VA, Plaintiff, who was 70 years old at the time, signed up for an annual employee medical screening which included a prostate specific antigen test ("PSA"), used to detect whether a male may have prostate cancer. (Doc. 58-2 at 28; Doc. 58-3 at 2). Until he underwent this screening, Plaintiff had never had a PSA test. (Doc. 58-2 at 28-29). The test was conducted on January 19, 2021—the

day before Plaintiff left his job at the VA—and it revealed an elevated PSA level of 16.9. (Doc. 53 at 1-2; Doc. 53-1 at 6; Doc. 57 at 2-3).  PSA levels between 4 and 10 are "suggestive of cancer in males" while levels above 10 are "highly suggestive of prostate cancer."  (Doc. 58-3 at 2).  Because the VA sent the lab results to Plaintiff's VA email address—which he could no longer access—Plaintiff was not timely informed of the elevated result.  (Doc. 53 at 2; Doc. 57 at 2).

Almost four months later, on May 8, 2021, during a life insurance screening process, Plaintiff underwent a second PSA test, which showed a PSA level of 23.6.  (Doc. 53 at 2-3; Doc. 53-1 at 5; Doc. 57 at 3).  Prompted by this result, Plaintiff underwent a third test on June 10, 2021, showing a PSA level of 25.8.  (Doc. 53 at 3; Doc. 53-3 at 4; Doc. 57 at 3).  In the following weeks, Plaintiff saw multiple providers for imaging, a biopsy, and other testing.  (Doc. 53 at 3-4; Doc. 57 at 3-4).

On July 23, 2021, Plaintiff began seeing oncologist Dr. Sandy T. Liu, M.D., at the University of California Los Angeles ("UCLA") for treatment of his prostate cancer, which now had a PSA level of 31.6.  (Doc. 53 at 4; Doc. 57 at 3, 6-7; Doc. 58-10 at 2-6).  For radiation therapy, Dr. Liu referred Plaintiff to Dr. Amar U. Kishan, M.D., a radiation oncologist at UCLA, who designed and administered a prolonged course of radiation for Plaintiff.  (Doc. 57 at 7-8; Doc. 58-10 at 2-10).

On October 20, 2022, Dr. Liu wrote a letter on behalf of Plaintiff, in which she states, among other things, that PSA

> [l]evels between 10 and 20 have to be regarded with serious concern for malignancy.  Further evaluation is mandatory with the urgent goal of defining the malignancy's presence while still within the prostate gland itself.  Any delay increases the probability of evolving metastasis, that is, spread into surrounding tissues.
>
> While serious malignancy can exist at only moderate high [PSA] levels even with high-grade tumors, the higher the level the more suspicion it becomes for high-grade, serious, malignant tumors.  Delay in evaluation and care of these cancers simply increases the probability of . . . metastasis.  Along with metastasis and increase growth in more locations comes higher values of PSA.
>
> [Plaintiff's] best hope for cancer limited to the prostate gland

existed while his PSA was at the lower level of 16. That time was also his best hope for resection of the prostate allowing a cure rate of 95%, and quickly return to work. Delayed recognition and management/treatment, as in his case, can exclude resection as a possible treatment and require drug and radiation therapy as his best chance for cure or remission. At that point the cure rate is approximately . . . 20%. . . .

. . . [Plaintiff] was not a surgical candidate . . .

Consultation with . . . [Dr. Kishan] confirmed that [Plaintiff's] best chances were with a medical therapy regimen together with radiation therapy.

(Doc. 58-12 at 2-3). Dr. Kishan provided a letter on November 3, 2022, with nearly identical language. (Doc. 58-14 at 2-3).

On December 12, 2022, Plaintiff brought this lawsuit, alleging that he "has a decreased chance of survival due to the" VA's failure to timely provide him with his January 19, 2021 lab results, including his PSA level. (Doc. 1 at 5). He further alleges that, "[d]ue to the untimely diagnosis, certain treatment options were eliminated which resulted in" a "lost opportunity for successful treatment of the prostate cancer." (*Id.*). Plaintiff's Complaint asserts one count of medical negligence under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* (*Id.* at 4-6).

In addition to producing his letters from Drs. Liu and Kishan, Plaintiff provided his own declaration on April 19, 2023 (the "April 2023 Declaration") in response to the Government's Motion to Dismiss, regarding his medical knowledge of the development of his prostate cancer, in which he states that

[a]s a physician, [he] understood a PSA of 16.9 . . . is a strong indication [he] had cancer in January of 2021. Likewise, [he] understood that the cancer had grown dramatically from January to June and even further in July of 2021.

. . . [He] could have had a resection of [his] prostate in January/February of 2021 with a survival rate of 95%. Delayed recognition and treatment rendered [him] a non-surgical candidate by July of 2021 with only a 20% survival rate.

(Doc. 16 at 14; Doc. 58-3 at 3).

The Case Management Order ("CMO") in this matter, issued May 10, 2024, dictates that the Plaintiff's expert disclosures under Federal Rule of Civil Procedure 26(a)(2)(A)-

(C) were due December 13, 2024.  (Doc. 36 at 3).  The parties' rebuttal expert disclosures were due February 7, 2025, while fact discovery closed February 28, 2025.  (*Id.* at 2-3).  The deadline for expert depositions was April 11, 2025.  (*Id.* at 3).

Plaintiff did not disclose any experts.  (Doc. 53 at 5).  In his second supplemental disclosure, dated September 24, 2024, Plaintiff listed himself and his "medical providers," including "Medical Oncology providers at UCLA," as witnesses but did not identify any providers.  (Doc. 53-12 at 8-9).  He stated that he

> anticipate[d] the providers listed above to have discoverable information regarding their observations of and conversations with Plaintiff, Plaintiff's alleged symptoms and injuries, and the treatment they provided to Plaintiff prior to and following the Accident and any recommendations for future treatment, if any, and the basis for the same.

(*Id.* at 9).  He also produced his medical records from UCLA, where Drs. Liu and Kishan worked.  (*Id.* at 10; Doc. 57 at 6).  As relevant here, he further disclosed that he anticipated calling "Medical Experts on Causation," but did not identify any experts.  (Doc. 53-12 at 9).

During his deposition on October 18, 2024, Plaintiff testified that he "absolutely had to have had" prostate cancer in January 2021 because with a PSA level of 16, he would be "absolutely worried about malignancy."  (Doc. 58-2 at 47).  He further opined that he "probably did not" have metastatic cancer at the time because "it's a matter of probabilities once you get between 10, 15, 16, . . . you're definitely concerned about significant incite to cancer, and that treatment is different."  (*Id.*).  For a PSA level to "skyrocket up . . . means generally metastatic development."  (*Id.*).  When asked whether "the approximate five-month delay in knowing the January 2021 PSA results impacted [his] prognosis," he responded with his "opinion [that] it converted [him] from a 90 percent survival rate, 10 percent failure rate to the reverse, to a 10 percent survival rate and 90 percent death rate."  (*Id.* at 47-48).  He testified that this change in his prognosis was "by virtue of" the change from "being a candidate for surgical excision and a cure . . . to a different category of treatment altogether."  (*Id.* at 48).

On May 23, 2025, the Government moved for summary judgment on the basis that Plaintiff cannot prove that the VA's actions caused his injury. (Doc. 52 at 1). Oral argument was held on May 15, 2026. (Doc. 61).

**DISCUSSION**

The Government's Motion for Summary Judgment disputes only one element of Plaintiff's claim: causation. The central issue between the parties is whether the medical opinions that Plaintiff intends to offer—from himself and his treating physicians, Drs. Liu and Kishan—are sufficient to survive summary judgment. The Government argues that Plaintiff fails to satisfy Arizona's substantive requirements for expert testimony in medical malpractice cases because (1) Plaintiff failed to disclose any experts under Rule 26 and (2) the expert testimony that Plaintiff seeks to offer is insufficient to establish causation. (Doc. 52 at 7-17; Doc. 59 at 1-9).

### I.    Summary Judgment Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*, 477 U.S. at 325). In any case, when considering motions for summary judgment, courts should construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in their favor. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts

to the nonmovant to demonstrate the existence of a material, factual dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[T]he threshold inquiry . . . [is] whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* Consequently, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

**II.     Expert Disclosures**

      **A.     Legal Standard**

As explicitly noted in the CMO (Doc. 36 at 3), the Federal Rules of Civil Procedure impose different disclosure requirements based on the type of witness. Fed. R. Civ. P. 26(a)(1)-(2). Expert testimony is disclosed under Rule 26(a)(2) and may require an additional written report. Fed. R. Civ. P. 26(a)(2)(B). An exception to the written report requirement exists for treating physicians but only "to the extent that [their] opinions were formed during the course of treatment." *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011). A treating physician that forms opinions outside of the course of treatment must provide a complete written report in compliance with Rule 26(a)(2)(B). *Id.*

Even when an opinion is formed during the course of treatment, however, treating physicians must still make certain disclosures under Rule 26(a)(2)(C). *Merch. v. Corizon Health, Inc.*, 993 F.3d 733, 739-40 (9th Cir. 2021) ("Nonetheless, disclosures of non-retained, treating physicians must include '(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify.'" (quoting Fed. R. Civ. P. 26(a)(2)(C))); (Doc. 36 at 3-4 n.2).

Improperly disclosed expert evidence, including that under Rule 26(a)(2)(C), may be excluded unless non-disclosure was "substantially justified or harmless." *Merch.*, 993 F.3d at 740. The non-compliant party bears the burden of raising and showing

harmlessness. *Key v. Qualcomm Inc.*, 129 F.4th 1129, 1143 (9th Cir. 2025); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).

### B. Analysis

#### 1. Plaintiff's failure to make required expert disclosures violated Rule 26 and the CMO.

As an initial matter, Plaintiff never disclosed any causation experts. (*See* Doc. 53-12 at 9). Rather, he simply indicated that he might call "Medical Experts on Causation" (*id.*) without identifying any such expert or providing any "summary of the facts and opinions to which the expert will testify" that could "provide fair notice of what the expert will say at trial" as required by the CMO (Doc. 36 at 3) and Rule 26(a)(2)(C).

Plaintiff argues that, under *Goodman*, Drs. Liu and Kishan did not need to be disclosed at all because they were his treating physicians. (Doc. 57 at 9-12). But *Goodman* provides a partial exception to the written report requirement, not to the disclosure requirement. *Merch.*, 993 F.3d at 739-40. Rule 26(a)(2)(C) still imposes a disclosure requirement for treating physicians offering expert testimony even when their opinions were formed during treatment. *Id.* Even accepting as true Plaintiff's claim that Drs. Liu and Kishan formed their causation opinions in the course of his treatment (Doc. 57 at 9-12), Plaintiff was required to disclose their identities and state both the subject matter of their testimony and a summary of the facts and opinions in that testimony. (Doc. 36 at 3); Fed. R. Civ. P. 26(a)(2)(C). He failed to do so.

Similarly, assuming that Plaintiff is qualified to offer expert testimony on medical causation for prostate cancer,[1] Plaintiff was required to disclose himself as an expert witness under Rule 26(a)(2)(C). Plaintiff did disclose himself as a witness but not as an expert and offered no description or report regarding his anticipated testimony. (Doc. 53-

---

[1] The Government implies that Plaintiff is not a qualified expert because he does not have expertise in urology or oncology. (*See* Doc. 52 at 11; Doc. 59 at 9). Plaintiff is a licensed physician and has been board certified in family medicine, emergency medicine, and forensic medicine. (Doc. 53 at 1, 5; Doc. 57 at 2). During his deposition, Plaintiff testified that while he knew of PSA testing, it was "not in [his] professional activity sphere of consciousness" because it is not something "useful . . . in emergency medicine." (Doc. 58-2 at 47). Because the parties do not provide substantive argument on this point, however, the Court will not address this issue.

12 at 8-9).  Accordingly, Plaintiff failed to disclose himself as an expert and violated Rule 26 and the CMO.

### 2.     Plaintiff's failure to disclose Drs. Liu & Kishan as experts cannot be considered harmless.

Plaintiff alternatively argues that any failure to disclose the expert testimony of Drs. Liu and Kishan was harmless because the Government "knew of the opinions contained in the records of [his] treating physicians," since he provided it with "medical records and correspondence."  (Doc. 57 at 12).  But Plaintiff's non-compliance with the rules of discovery was not harmless because Plaintiff never disclosed experts, even after the Government disclosed its own, and because the Government did not have the opportunity to depose Drs. Liu and Kishan as causation experts before the close of expert discovery in April 2025.  (Doc. 59 at 6).  Though Plaintiff has borne the burden of raising harmlessness as to Drs. Liu and Kishan, simply stating that his violations of Rule 26 and the CMO were "harmless" does not satisfy his burden of "showing harmlessness."  *Key*, 129 F.4th at 1143; *Yeti*, 259 F.3d at 1107.  As such, Plaintiff cannot introduce any expert testimony through Drs. Liu or Kishan.

### 3.     Plaintiff's failure to disclose himself as an expert was harmless.

In contrast, Plaintiff's failure to disclose himself as an expert was rendered harmless because the Government had notice of Plaintiff's opinions (Doc. 58-3) and was able to depose him on the basis of the opinions that he offered in his April 2023 Declaration (Doc. 58-2 at 47-48).  Indeed, in his April 2023 Declaration, Plaintiff does opine—"[a]s a physician"—that the PSA level of 16.9 was "a strong indication" of cancer, "that the cancer had grown dramatically from January to June" of 2021, and that he "could have had a resection of his prostate in January/February 2021 with a survival rate of 95%." (Doc. 58-3 at 2-3).  During Plaintiff's deposition, the Government asked about—and Plaintiff explained—his opinions on the meaning of a "skyrocket[ing]" PSA level, survival rates associated with surgical eligibility or ineligibility, and the relationship between the two.

(Doc. 58-2 at 47-48). Moreover, at Oral Argument, the Government did not provide any legal authority to suggest that, in light of these facts, it was prejudiced by Plaintiff's failure to disclose himself. Accordingly, Plaintiff is not barred from offering his own expert testimony despite his violations of Rule 26 and the CMO.

### III.    Arizona Medical Malpractice & Causation

With no summary of the intended testimony or the underlying facts and opinions, the Court's assessment of the proffered expert testimony relies on Plaintiff's April 2023 Declaration[2] and on Plaintiff's deposition testimony.[3] Plaintiff alleges that he was injured by the delayed diagnosis of his prostate cancer because it eliminated the option to undergo surgical resection of the prostate rather than having to undergo radiation and thus decreased his chances of survival. (Doc. 1 at 5; Doc. 57 at 3-4). Resection—which may be an option while the cancer is limited to the prostate gland—has a higher survival rate than drug and radiation therapy and would allow a faster recovery.[4] (Doc. 57 at 3). As discussed below, Plaintiff has sufficiently demonstrated a genuine issue of material fact as to causation on his loss-of-chance theory by pointing to evidence in the record upon which a fact-finder could find that the VA's delay in providing his PSA results substantially decreased his chance of survival or better recovery. As such, his claim survives summary judgment.

### A.    Legal Standard

The FTCA provides that plaintiffs may recover money from the United States for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment,

---

[2] The Court does not consider Plaintiff's June 2025 Declaration because it not only post-dates his December 2024 expert disclosure deadline but also the February 2025 rebuttal expert disclosure deadline, the February 2025 fact discovery deadline, and the April 2025 expert deposition deadline.

[3] As the Government pointed out in its Reply (Doc. 59 at 2 n.2), Plaintiff did not file a controverting statement of facts in conjunction with his Response. (*Compare* Doc. 57, *with* Doc. 58). Plaintiff did, however, provide his exhibits (Docs. 58-1–58-15), which, to the extent they were disclosed prior to the discovery cut-off in this matter, the Court considered in its analysis.

[4] Plaintiff asserts in his April 2023 Declaration that surgical resection has a 95% cure rate and that radiation therapy has a 20% cure rate. (Doc. 58-3 at 3). In his Response and Deposition, however, he claims that surgical resection has a 90% cure rate and that radiation therapy has a 10% cure rate (Doc. 57 at 3; Doc. 58-2 at 47-48).

- 9 -

under circumstances where the United States, if a private person, would be liable to the claimant." 28 U.S.C. § 1346(b)(1).  Liability is determined by the law of the state where the incident occurred—in this case, Arizona.  *Id.*

"In medical malpractice actions, as in all negligence actions, the plaintiff must prove the existence of a duty, a breach of that duty, causation, and damages." *Henke v. Hosp. Dev. of W. Phx.*, 578 P.3d 47, 52 (Ariz. 2025) (quoting *Seisinger v. Siebel*, 203 P.3d 483, 492, 220 Ariz. 85, 94 (2009)).  To establish the elements of duty and breach, a plaintiff must show that "[t]he health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider [in Arizona] in the [provider's] profession or class . . . in the same or similar circumstances." A.R.S. § 12-563.  As for the element of causation, a plaintiff must prove that "[s]uch failure was a proximate cause of the injury," *id.*, by showing "a natural and continuous sequence of events stemming from the defendant's act or omission, unbroken by any efficient intervening cause, that produces an injury, in whole or in part, and without which the injury would not have occurred." *Henke*, 578 P.3d at 52 (quoting *Sampson v. Surgery Ctr. of Peoria, LLC*, 491 P.3d 1115, 1118, 251 Ariz. 308, 311 (2021)).

But, in certain cases, when the "defendant has negligently breached an undertaking to prevent a certain harm," the "threshold of proof to reach a jury on causation" is lower. *Lohse v. Faulter*, 860 P.2d 1306, 1314, 176 Ariz. 253, 261 (Ct. App. 1992) (quoting *Thompson v. Sun City Cmty. Hosp., Inc.*, 688 P.2d 605, 613-14, 141 Ariz. 597, 605-06 (1984)).  Then, "even if the evidence permits only a finding that the defendant's negligence increased the risk of harm or deprived plaintiff of some significant chance of survival or better recovery, it is left for the jury to decide whether there is a probability that defendant's negligence was a cause in fact of the injury." *Thompson*, 688 P.2d at 614, 141 Ariz. at 606. This standard reflects the difficulties of assessing causation when the "[d]efendant's negligent act or omission made it impossible to find with certainty what would have happened . . . forc[ing] the court to look at the proverbial crystal ball in order to decide what might have been." *Id.* at 616, 141 Ariz. at 608.

Indeed, a plaintiff must show that there was a "substantial possibility of survival" or better recovery. *Lohse*, 860 P.2d at 1316, 176 Ariz. at 263 (citing *Hicks v. United States*, 368 F.2d 626, 632 (4th Cir. 1966)). It cannot be speculative as to whether the defendant "would have been positioned to prevent harm." *Id.* Yet even where a defendant is positioned to prevent harm, the plaintiff must show that the defendant's "actions increased the risk of harm to her beyond that which existed in the absence of" those actions. *Stanley v. McCarver*, 92 P.3d 849, 854, 208 Ariz. 219, 224 (2004); *Lohse*, 860 P.2d at 1316, 176 Ariz. at 263. And "the proof . . . must rise to the level of substantiality." *Lohse*, 860 P.2d at 1316, 176 Ariz. at 263. In other words, a plaintiff cannot solely rely on the argument that the defendant's actions "increased the probability" of injury, because "probability runs from infinitesimal to nearly certain" and "can increase from one to another insignificant degree." *Lohse*, 860 P.2d at 1317, 176 Ariz. at 264.

### B.    Analysis

Here, Plaintiff has alleged a loss-of-chance in survival and ability to successfully treat his prostate cancer due to the VA's failure to timely provide him with his January 19, 2021 lab results, including his PSA level. (Doc. 1 at 5). The crucial issue is whether the VA, "in the absence of negligence, would have been positioned to prevent harm"—i.e., whether the absence of negligence would have had a significant impact on Plaintiff's probability of survival or better recovery. Plaintiff's proffered expert testimony could support a finding that the VA's delay increased the risk of harm by allowing the cancer to grow and his PSA level to rise between January and July 2021, making it more likely that his cancer metastasized and less likely that he was surgical candidate, which in turn impacted his chance of survival or better recovery. (Doc. 58-2 at 47-48; Doc. 58-3 at 3). Plaintiff opined that he "could have had a resection of [his] prostate in January/February 2021," (Doc. 58-3 at 3), and provided probabilities of survival or a cure based on his eligibility for prostate resection—90-95% if eligible, and 10-20% if ineligible (Doc. 58-2 at 47-48; Doc. 58-3 at 3).

While evaluating causation on these facts may require speculation, in a loss-of-

chance case, a fact-finder is permitted "to engage in some speculation with regard to cause and effect." *Thompson*, 688 P.2d at 616, 141 Ariz. at 607. Indeed, Plaintiff's case is a core example of loss-of-chance, where the VA's "negligent act or omission made it impossible to find with certainty what would have happened" if Plaintiff had been apprised of his PSA results so that the extent of his cancer and his eligibility for surgery could have been assessed in January 2021. *Id.* at 616, 141 Ariz. at 608. In other words, at the summary judgment stage, the VA may not benefit from the lack of certainty created by its alleged negligence.

**CONCLUSION**

Because Plaintiff's failure to disclose Drs. Liu and Kishan was not harmless, Plaintiff may not rely on their expert testimony. As such, Plaintiff's own expert testimony is the basis for the Court's finding that Plaintiff has sufficiently identified evidence in the record to survive summary judgment. Because Plaintiff's proffered expert testimony is indeed sufficient to support his loss-of-chance theory at the summary judgment stage,

**IT IS ORDERED** that the Government's Motion for Summary Judgment (Doc. 52) is **DENIED**.

Dated this 21st day of May, 2026.

G. Murray Snow
Senior United States District Judge